## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **DEWIN LYNN MADILL**, | Case No. **11-61317-7** |
| Debtor. | |
| | |
| **JOSEPH V. WOMACK**, | |
| Plaintiff. | |
| -vs- | |
| **DEWIN LYNN MADILL** and **ROCHELLE MADILL**, | Adv No. **13-00022** |
| Defendants. | |

## MEMORANDUM of DECISION

At Butte in said District this 1ˢᵗ day of April, 2014.

In this Adversary Proceeding, after due notice, trial was held February 11, 2014, in Butte.

The Plaintiff/Trustee, Joseph V. Womack of Billings, Montana, ("Womack") appeared at trial.

The Defendant/Debtor DeWin Madill ("DeWin") appeared at trial and was represented by Harold

V. Dye of Missoula, Montana; Defendant Rochelle Madill ("Rochelle") appeared at trial and was

represented by Ross P. Richardson of Butte, Montana.  John Hanson, DeWin, Rochelle, and

Sherill Frickle testified.  The parties stipulated to the admission into evidence of DeWin's

Exhibits A through I and Womack's Exhibits 1 through 28.  At the conclusion of the trial, the

Court gave the parties time to file post-trial briefs.  Post-trial briefs have been filed and the

matter is ready for decision.

## CONTENTIONS of the PARTIES

Womack seeks, under 11 U.S.C. §§ 362, 544, 548, 549, and 550, and the Montana

Uniform Fraudulent Transfer Act ("UFTA"), to avoid and recover damages caused by DeWin's

transfer of two vehicles, a 2005 Cadillac Escalade EXT, VIN 3GYEK62N25G21936 ("2005

Escalade"), and a 2007 Cadillac Escalade ESV, VIN 1GYFK66877R278186 ("2007 Escalade")

to his nondebtor spouse.  Defendants deny that the transfers were fraudulent and contend that

they were prepetition transfers for reasonably equivalent value, deny that Plaintiff is entitled to

recover any damages for the transfers and contend that no violation of the automatic stay

occurred.  DeWin also seeks damages for the Trustee's alleged violation of the discharge

injunction.

## JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334

and 157.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This Adversary Proceeding is a

"core" proceeding pursuant to 28 U.S.C. § 157(b) in that the complaint is an action to avoid and

recover allegedly fraudulent transfers and damages for stay violation and the counterclaim seeks

damages for violation of the discharge injunction.  Both Defendants consented to trial by this

Court, including the ability of said Court to issue a final judgment.

## FACTS

The parties agree that DeWin is the Debtor in the underlying bankruptcy case, and that he

commenced his Chapter 7 bankruptcy on July 6, 2011.  Plaintiff is the Chapter 7 Trustee in

DeWin's underlying bankruptcy case and was appointed to serve as Trustee on July 7, 2011.

Rochelle is and was at all times relevant the nondebtor spouse of DeWin.

At the time DeWin filed his petition, he filed schedules disclosing assets totaling $1,269,992 and liabilities totaling $10,361,929.16.  DeWin also disclosed that his monthly income was $4,000, and Rochelle's was $3,000.  DeWin and Rochelle's monthly expenses were $10,312, which amount included a mortgage payment of $4,898 and a monthly food expense of $1,800.  DeWin received a Chapter 7 discharge on November 15, 2011.  Womack commenced this Adversary Proceeding on July 2, 2013.

In March of 2005, DeWin purchased a 2005 Escalade from Whiting Motors in Livingston, Montana.  The 2005 Escalade was titled in DeWin's name, and since March of 2005, has been and still is DeWin's primary vehicle.  In October of 2006, DeWin purchased a 2007 Escalade from Whiting Motors.  The 2007 Escalade was titled in DeWin's name.  Since October of 2006, the 2007 Escalade has been and still is Rochelle's primary vehicle.  DeWin did not list either the 2005 Escalade or the 2007 Escalade in his bankruptcy schedules, but instead disclosed in his Statement of Financial Affairs that he sold the 2005 Escalade to Rochelle on May 23, 2011, for $14,830.00 and sold the 2007 Escalade to Rochelle on May 17, 2011, for $22,405.00.

Rochelle testified that DeWin asked her to buy the Escalades after DeWin and Rochelle received a foreclosure notice from Bank of America.  According to Rochelle, DeWin consulted with his attorney and learned that Rochelle could buy the vehicles from DeWin and DeWin could use the money to make mortgage payments and pay other household bills.

Records from the State of Montana, Department of Justice, Motor Vehicle Division show that DeWin's Certificate of Title, showing the transfer of the 2005 Escalade from DeWin to Rochelle, was notarized on September 3, 2011, and that the "vehicle sale date" for the 2005

Escalade was October 31, 2011.  A Certificate of Title for the 2005 Escalade showing Rochelle as the owner was issued on January 9, 2012.  Records from the Montana Department of Motor Vehicles similarly show that DeWin's Certificate of Title, showing the transfer of the 2007 Escalade from DeWin to Rochelle, was notarized on September 3, 2011, and that the "vehicle sale date" for the 2007 Escalade was October 31, 2011.  A Certificate of Title for the 2007 Escalade showing Rochelle as the owner was issued on January 9, 2012.

In May of 2011, at the time of the alleged sale, DeWin consulted Kelley Blue Book at www.kbb.com/used-cars to determine the value of the 2005 Escalade and the 2007 Escalade.  As of May 20, 2011, Kelley Blue Book showed that the value of the 2005 Escalade was $19,130 if in excellent condition, $18,030 if in good condition, and $16,280 if in fair condition.  Also as of May 20, 2011, Kelley Blue Book showed that the value of the 2007 Escalade was $29,820 if in excellent condition, $27,920 if in good condition, and $25,020 if in fair condition.  A "good" vehicle condition rating applies to vehicles that are free of any major defects, have a clean title history, the paint, body and interior of the vehicle have only minor (if any) blemishes, no major mechanical problems exist, little or no rust on the vehicle exists, and the tires match and have substantial tread left.  The report from Kelley Blue Book, Exhibit 14, p.3, states that "[m]ost consumer owned vehicles fall into" the "good" rating.  A "fair" rating applies to vehicles that have some mechanical or cosmetic defects and need servicing but are still in reasonable running condition, have a clean title history, the paint, body and/or interior need work performed by a professional, tires may need to be replaced and some repairable rust damage exists.

DeWin subtracted $1,450, for "Ressler Payment," from the fair value of the 2005 Escalade to reach a value of $14,380.  DeWin also subtracted $2,615 from the Kelley Blue Book

4

fair value of the 2007 Escalade to reach a value of $22,405.  The $2,615 is based on an estimate

to repair body damage to the 2007 Escalade provided by Ressler Motor Co.  *See* Exhibit 16.

DeWin and Rochelle maintained a joint bank account, and Rochelle maintained a

separate bank account in her name.  Exhibit 22 reflects that DeWin and Rochelle's joint bank

account had a balance of $1.82 as of March 11, 2011, through May 10, 2011.  The statement of

the joint bank account reflects two deposits of $5,000 and $21,405[1] made on May 23, 2011, and

another for $10,830 made on May 26, 2011.  Those deposits are payments for the 2005 Escalade

and 2007 Escalade.  The first several checks written by DeWin after depositing the $26,405, were

written on counter checks, rather than preprinted checks.  DeWin made a mortgage payment to

Bank of America of $5,142.55 on May 24, 2011, made a second payment in the same amount on

May 27, 2011, made a third payment of $4,897.67 on May 29, 2011, and made a fourth mortgage

payment of $4,897.67 on May 30, 2011.  DeWin and Rochelle were jointly obligated on their

mortgage.  DeWin explained that Rochelle made the first three payments in 2011, and then the

mortgage went into default.[2]  DeWin cured the default with the four payments he made in May.

DeWin also made a payment to his attorneys, Dye & Moe of $883.08 on May 26, 2011, and

between May 18, 2011, and June 23, 2011, DeWin and Rochelle wrote additional checks totaling

---

[1] The $21,405 deposit consisted of two checks:  check no. 1130 dated May 24, 2011, in the amount of $17,405 and check no. 1132 dated May 24, 2011 in the amount of $4,000.

[2] Exhibit 24 shows Rochelle made a payment of $4,897.67 to "BAC Home Loans" on January 10, a payment of $5,142.55 to "BAC" on March 15, and a payment of $5,142.55 to "BAC Home Loans" on May 6.  DeWin and Rochelle received a Notice of Intent to Accelerate from Bank of America dated April 18, 2011, demanding payment of $10,070.22 by May 18, 2011.

$16,734.97 for ordinary living expenses.[3]  After two deposits totaling $59.03 were deposited into the account, and after Rochelle made three separate transfers into the account of $300.00, $50.00 and $75.00 on June 13, 2011, June 29, 2011, and July 5, 2011, respectively, the ending balance in the joint account as of July 5, 2011 – one day prior to DeWin's petition date – was $22.36.

Rochelle's separate bank account had a balance of $9,585.26 on May 22, 2011.  On May 23, 2011, Rochelle received $141,976.17 from DeWin's mother, Betty Madill, and deposited that money into her joint account.  On May 25, 2011, Rochelle wrote a check to Betty Madill in the amount of $51,937.50.  The check cleared Rochelle's account on May 31, 2011.  When asked why Rochelle made that payment to Betty Madill, Rochelle testified:

> Because I asked my mother law if I could use her credit card to pay this so I could earn miles and then when a job I was doing paid me, I would reimburse her and she said that was fine.

Rochelle's explanation is curious because it appears Betty Madill would earn the miles, and not Rochelle.  Also, the balance in Rochelle's account was $3,843.36 on May 23, 2011, and the only sizeable deposit made into her account prior to May 25, 2011, was the deposit of $141,976.17 on May 23, 2011, which funds came from Betty Madill, and not payment for a job.  The Court would also note that on May 25, 2011, $100.00 was transferred into Rochelle's account from "Power of God Ministry, " and on May 31, 2011, another $500.00 was transferred into Rochelle's account from "Power of God Ministry."  These two deposits represented payments to DeWin that were deposited into Rochelle's account.

Sometime prior to his bankruptcy petition date, DeWin personally guaranteed several loans between Flathead Bank of Bigfork, Valley Bank of Belgrade Branch ("Flathead Bank") and

---

[3] On page 12 of exhibit 22, Rochelle wrote seven of the eight listed checks.

various corporate entities owned by DeWin.  One such loan DeWin personally guaranteed was a loan between Flathead Bank and Designer Emporium, Inc.  In early 2011, Flathead Bank filed a complaint against DeWin seeking a judgment in the amount of $93,619.72, together with interest and attorney's fees, for DeWin's personal guarantee of the Designer Emporium, Inc. debt. Flathead Bank's Amended Complaint, which was filed in the Montana Eighteenth Judicial District Court, Gallatin County, was served on DeWin's counsel, Harold V. Dye.  On May 19, 2011, Flathead Bank filed a motion for summary judgment.  Although DeWin did not oppose the motion for summary judgment, at the request of Harold V. Dye, a hearing on Flathead Bank's motion for summary judgment was scheduled for August 18, 2011.  Prior to the summary judgment hearing, DeWin filed his bankruptcy petition, and filed a notice of such in the State district court on July 8, 2011.  The sole purpose of that litigation was to collect on the debt personally guaranteed by DeWin.

DeWin and Rochelle also owned, since 2001, a home located at 1200 Mount Ellis Lane in Bozeman, Montana.  DeWin listed the value of the home in his schedules as $1.2 million.  The home was encumbered by an obligation owing to Bank of America in the approximate amount of $900,000.  DeWin and Rochelle each owned a 50 percent interest in the home as joint tenants. At one time, Rochelle also owned a 100 percent interest in a vacant parcel of land that was adjacent to their home on Mount Ellis Lane.  Prepetition, DeWin and Rochelle did a boundary adjustment between their home and the vacant lot that decreased the size of the lot on which their home sat and increased the size of the vacant lot.  DeWin and Rochelle did the boundary adjustment so they could reduce the selling price of their home.  Following the boundary adjustment, DeWin had a 20 percent ownership interest in the vacant lot.

In addition to the foregoing, DeWin was the sole or majority shareholder of Covenant

Investments, Inc.  Covenant Investments, Inc. file a voluntary Chapter 11 bankruptcy petition on

August 20, 2010.  Rochelle was not aware of Covenant Investments, Inc.'s bankruptcy for some

time, explaining she does not remember DeWin telling her about that bankruptcy right away.

Covenant Investments, Inc.'s Second Amended Chapter 11 Plan was confirmed on May 19,

2011.

## APPLICABLE LAW

The threshold inquiry in this case is what interest, if any, the bankruptcy estate had in the

2005 Escalade and the 2007 Escalade on July 6, 2011, the date DeWin filed his bankruptcy

petition.  Section 541(a) of the Bankruptcy Code defines "[p]roperty of the estate" to include "all

the following property, wherever located and by whomever held:"

> (1) . . . all legal or equitable interests of the debtor in property as of the
> commencement of the case. (emphasis added).

The above definition refers to "legal" and "equitable" in the disjunctive and thus, property in

which the debtor has an equitable interest is included as property of the estate under § 541(a).  In

discussing the broad definition of "property of the estate", this Court wrote:

> Section 541(a)(1) of the Bankruptcy Code is intended to include in the estate "all
> legal or equitable interests of the debtor in property as of the commencement of
> the case."  *In re Campbell (Balyeat Law Offices v. Campbell)*, 14 Mont. B.R. 132,
> 140-41 (9th Cir. BAP 1995).  In *Campbell* the BAP wrote:
>
> > The legislative history indicates that the scope of § 541(a)(1) is
> > broad.  *See United States v. Whiting Pools, Inc.*, 468 U.S. 198, 205
> > (1983).  Section 541(a)(1) is intended to include in the estate any
> > property made available to the estate by any other provisions of the
> > Bankruptcy Code.  *Id.* (*citing* H.R. Rep. No. 95-595, p. 367
> > (1977)).  Several provisions in the Code permit the trustee to
> > recover property in which the debtor did not have a possessory

> interest when the bankruptcy petition was filed.  *See, e.g.,* 11
> U.S.C. §§ 543, 544, 547 & 548; *Whiting Pools,* 462 U.S. at 205.
> Thus, "[a]n estate in bankruptcy consists of all the interests in
> property, legal and equitable, possessed by the debtor at the time of
> filing, as well as those interests recovered or recoverable through
> transfer and lien avoidance provisions."  *Owen v. Owen*, 500 U.S.
> 305, 308 (1991).

*In re Weatherwax*, 16 Mont. BR 304, 308-09 (Bankr. D. Mont. 1997).

The Court must examine Montana law to determine what interest, if any, Rochelle had in

the 2005 Escalade and 2007 Escalade on July 6, 2011:

> [S]tate law determines the extent of [a party's] interests [in property] and
> when these interests expire.  *In re Contractors Equip. Supply Co.*, 861
> F.2d 241, 244 (9th Cir. 1988); *In re Farmers Markets, Inc.*, 792 F.2d 1400,
> 1402 (9th Cir. 1986).  "State law, however, must be applied in a manner
> consistent with federal bankruptcy law."  *In re Sierra Steel, Inc.*, 96 B.R.
> 271, 273 (9th Cir. BAP 1989) (*citing In re North Am. Coin & Currency,
> Ltd*., 767 F.2d 1573, 1575 (9th Cir. 1985), *amended,* 774 F.2d 1390 (9th
> Cir. 1985), *cert. denied sub nom. Daniel A. Torres, M.D., P.C. v. Eastlick*,
> 475 U.S. 1083 (1986)).
>
> 14 Mont. B.R. at 141-42.

> Furthermore, "The bankruptcy estate succeeds to no more interest than the
> Debtor possessed or had, and the estate takes its interest subject to such
> conditions."  *In re Kleffner*, 14 Mont. B.R. 10, 15 (Bankr. Mont. 1994) (quoting
> *In re Baquet*, 61 B.R. 495, 497-98 (Bankr. Mont. 1986)).

*In re Weatherwax*, 16 Mont. B.R. at 308-09.  *See also Nobelman v. Am. Sav. Bank*, 508 U.S. 324,

329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has

'left the determination of property rights in the assets of a bankrupt's estate to state law,' since

such '[p]roperty interests are created and defined by state law.'  *Butner v. United States*, 440 U.S.

48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).  *See also Barnhill v. Johnson*, 503 U.S.

393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).")

Historically, the rebuttable presumption in Montana was the person appearing on the public record as the vehicle's registrant was deemed the vehicle's owner. *See* MONT. CODE ANN. ("MCA") § 61-3-105 (repealed 2003). The legislature repealed the provision and eliminated the statutory presumption. However, no court has overruled the presumption. Regarding ownership of motor vehicles and the extent of a party's interest therein, Montana motor vehicle law recognizes equitable interests in motor vehicles in limited instances:

> "Owner" means a person who holds the legal title to a vehicle. If a vehicle is the subject of an agreement for the conditional sale of the vehicle with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee, or in the event a vehicle is subject to a lease, contract, or other legal arrangement vesting right of possession or control, for security or otherwise, or in the event a mortgagor of a vehicle is entitled to possession, then the owner is the person in whom is vested the right of possession or control.

MCA § 61-1-101(52) (2011).

In Montana, holding title to a vehicle does not provide conclusive evidence of ownership and strict adherence with certificate of title statutes is not required for a change of vehicle ownership. Absent a statutorily proscribed title transfer creating legal ownership, common law requires determination of equitable ownership by a facts and circumstances test.

Equitable Ownership

A claimant must establish two elements to prove equitable ownership. First, the vehicle must be the subject of an arrangement concerning the vehicle. Second, the claimant must possess the vehicle after an intentional ownership transfer. *Safeco Ins. Co. v. Lapp,* 215 Mont. 196, 695 P.2d 1310 (1985); *In re Towe,* 225 Mont. BR 492 (Bankr. D. Mont. 1997).

The first component of equitable ownership requires a conditional sales agreement, a

lease, contract, or other legal arrangement concerning the vehicle, or a mortgagor entitled to possession.  MCA § 61-1-101(46); *Richardson v. Becker* (*In re Anderson*), 19 Mont. B.R. 404 (Bankr. D. Mont. 2001).  Absent an arrangement, the vehicle's possessor is not the equitable owner when another party holds legal title.  *Anderson,* 19 Mont. BR at 409-09.  In *Anderson*, the debtor held legal title to a motorcycle.  A third party claimant possessed the motorcycle, had sole use and control, and paid all licensing and insurance expenses. Finding no agreement between debtor and possessor concerning the motorcycle and that no mortgagor was entitled to the motorcycle's possession, this Court held the possessor's equitable ownership claim without merit and found the motorcycle's legal title holder the owner.

Here, DeWin and Rochelle contend the Escalades are the subject to an arrangement. Unlike the motorcycle in *Anderson* where no arrangement existed between the title holder and possessor, the Escalades are arguably the subject of an arrangement or agreement between DeWin and Rochelle, as evidenced by the checks written by Rochelle and deposited into DeWin and Rochelle's joint checking account and as reflected in Exhibits 17 and 18.  Existence of an arrangement concerning the Escalades allows the equitable ownership analysis to proceed to the second element, possession after an intentional ownership transfer.

The second component of equitable ownership requires the claimant to possess the vehicle after an intentional transfer of ownership. *Towe,* 225 Mont. BR at 497; *Lapp*, 215 Mont. at 199-200.  In *Towe,* possession of an antique vehicle transferred from the title holder to an auto museum.  Title remained with transferor.  The parties disputed the facts, but this Court found evidence establishing an intentional sale.  Reasoning the title holder intended a sale on transfer of possession to the museum, this Court held transferor's retention of title irrelevant and deemed the

11

vehicle's possessor, the auto museum, the equitable owner.

Similarly, in *Lapp*, an automobile dealer delivered a vehicle to purchaser under a completed sales contract. Both parties intended a sale. Title did not pass to purchaser; dealer did not complete all necessary statutory requirements to transfer title. Noting purchaser's right to use or dispose of the automobile as he wished and dealer's relinquishment of all legal rights to the vehicle on sale, the Montana Supreme Court held ownership transferred to the purchaser on delivery despite title remaining with the dealer.

As previously noted, DeWin has used the 2005 Escalade as his primary vehicle since March of 2005, and continues to do so to this date. Rochelle has used the 2007 Escalade as her primary vehicle since October of 2006. The use and possession of neither vehicle changed in May of 2011. Under the facts of this case, DeWin still arguably possesses the 2005 Escalade, and he does from time to time use the 2007 Escalade. The Court is not persuaded that an intentional transfer of ownership occurred, particularly where neither DeWin nor Rochelle presented evidence that Rochelle took over other expenses of ownership, such as paying the insurance or purchasing new license plates.

The Court finds DeWin still possesses the 2005 Escalade. Therefore, Rochelle was not, as of July 6, 2011, the owner of the 2005 Escalade under an equitable ownership theory. The Court similarly finds, under the particular facts of this case, that Rochelle's possession of the 2007 Escalade, as of July 6, 2011, was not incident to an intended transfer of ownership under an equitable ownership theory.

Legal Ownership

Having failed to satisfy the equitable ownership theory, the Court next looks for

compliance with statutory vehicle transfer provisions under a legal ownership theory.  Statutory

provisions establish methods for transferring vehicle ownership:

> (1) Upon the voluntary *transfer* of any interest in a motor vehicle . . . for which a certificate of title was issued . . the owner whose interest is to be transferred shall:
>
>> (a) authorize, in writing and on a form prescribed by the department . . . to enter the transfer of the owner's interest in the motor vehicle . . . to the transferee on the electronic record of title . . . or
>>
>> (b) execute a transfer in the appropriate space provided on the certificate of title issued to the owner and deliver the assigned certificate of title to:
>>
>>> (i) the transferee at the time of delivery of the motor vehicle . . . or
>>>
>>> (ii) the department . . . if an application for a certificate of title has been completed by the transferee and accompanies the assigned certificate of title.
>
> (2) The transferor's signature on the certificate of title, or the form authorizing transfer of interest upon the electronic record of title, must be acknowledged before the county treasurer, a deputy county treasurer, an elected official authorized to acknowledge signatures, an employee or authorized agent of the department, or a notary public.
>
> (3) Except as provided in 61-4-111, the person to whom an interest in a motor vehicle has been transferred shall:
>
>> (a) execute an application for a certificate of title in the space provided on the assigned certificate of title or as prescribed by the department; and
>>
>> (b) within 40 days after the interest in the motor vehicle . . . was transferred to the person, either:
>>
>>> (i) apply for a certificate of title under 61-3-216 and register the motor vehicle . . . under 61-3-303; or
>>>
>>> (ii) subject to the limitations of 61-3-312, register the motor vehicle . . . without the surrender of a previously assigned certificate of title and application for certificate of title under 61-3-303.

MCA § 61-3-220 (2011) (emphasis added).

13

DeWin did not comply with MCA § 61-3-220(2) to transfer the Escalades' ownership to Rochelle until September 3, 2011, and Rochelle did not comply with MCA § 61-3-220(3) by applying for a certificate of title until October 31, 2011. Absent a finding of equitable ownership and absent compliance with statutory requirements transferring vehicle ownership until after July 6, 2011, the Court finds ownership was vested in the owner reflected on the certificates of title as of July 6, 2011, DeWin Madill. The Court's above finding negates DeWin's contention that Womack violated the discharge injunction.

DeWin's post-petition transfer of the 2005 Escalade and the 2007 Escalade to Rochelle after DeWin's petition date, without authorization under the Bankruptcy Code or from this Court, is avoided pursuant to 11 U.S.C. § 549(a). If DeWin and Rochelle still have possession of the Escalades, the appropriate remedy is the immediate turnover of the 2005 Escalade and the 2007 Escalade to Womack. If DeWin and Rochelle no longer have the Escalades, the appropriate remedy under 11 U.S.C. § 550 is judgment against Rochelle for the value of the Escalades.

DeWin testified that the 2005 Escalade was worth $14,830.00 and that the 2007 Escalade was worth $22,405.00. However, the Court finds that Kelley Blue Book's definition of "fair" value already contemplates the work referenced in the Ressler Motor Co. estimate. Therefore, the Court sets the value of the of the 2005 Escalade and the 2007 Escalade at $16,280 and $25,020, respectively.

Also, because the post-petition transfer was a voluntary transfer initiated by DeWin, and not an involuntary transfer initiated by a creditor, the Court finds that 11 U.S.C. § 362 is not applicable. As aptly reasoned by the Honorable Jim D. Pappas:

The apparent overlap of §§ 362 and 549 was analyzed by the Ninth Circuit in

14

[*Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 573-74 (9th Cir. 1992)]. The Ninth Circuit concluded therein that the fundamental factor in determining whether analysis should proceed under § 362 or § 549 is the identity of the transfer-initiating party. *See id.* at 574. As a baseline, "[t]he law in this circuit is ... that [§ ] 549 applies to transfers of property which are not voided by the stay." *Id*. If a creditor attempts to create an unauthorized post-petition lien on property of the estate, that transfer is void as a violation of the automatic stay. *Id.* If, however, a debtor in a bankruptcy case initiates an unauthorized post-petition transfer of estate property, the § 362 automatic stay does not apply. *See id.* Instead, § 549 applies and creditors may assert the limited protections to transfer avoidance afforded by § 549(c). *Id.*

*Hopkins v. Suntrust Mortg. Inc. (In re Ellis)*, 441 B.R. 656, 662-63 (Bankr. D. Idaho 2010).

For the reasons stated above,

IT IS ORDERED that the Court will enter a separate Judgment in favor of the Plaintiff, Joseph V. Womack, and against the Defendants, Rochelle Madill and DeWin Lynn Madill; and Rochelle Madill and DeWin Lynn Madill shall immediately deliver to the Plaintiff the 2005 Cadillac Escalade EXT, VIN 3GYEK62N25G21936 and the 2007 Cadillac Escalade ESV, VIN 1GYFK66877R278186. In the alternative, if Rochelle Madill and DeWin Lynn Madill no longer have possession of the 2005 Cadillac Escalade EXT, VIN 3GYEK62N25G21936 and the 2007 Cadillac Escalade ESV, VIN 1GYFK66877R278186 and are thus unable to immediately deliver said vehicles to the Plaintiff, then Judgment is entered against Rochelle Madill in the amount of $41,300.00.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

15

16